·[No. 2390.]

## JIM CURTIS *v.* THE STATE.

1. AGGRAVATED ASSAULT AND BATTERY—FORMER ACQUITTAL AND CON-VICTION—JEOPARDY—MURDER—CASE APPROVED.—A conviction for aggravated assault and battery under an indictment for assault with intent to murder will not operate to bar a prosecution for murder after the death of the assaulted party, the death resulting from the same transaction. Plea of former acquittal, conviction and jeopardy, based upon the trial of the defendant under an indictment for assault with intent to murder, and his conviction for aggravated assault and battery, prior to the death of the assaulted party, interposed to a prosecution for murder after the death of a party, was properly rejected by the jury in this case. Note the opinion for an approval of the doctrine laid down in Johnson's case, 19 Texas Court of Appeals, 453; and note also the distinction between the cases *held* immaterial in principle.

2. NEGLIGENT HOMICIDE—EVIDENCE—CHARGE OF THE COURT.—See the statement of the case for evidence in a murder trial *held* to demand a charge upon negligent homicide in the second degree.

APPEAL from the District Court of Williamson. Tried below before the Hon. A. S. Walker.

Under an indictment charging him with the murder of George Walton, in Williamson county, Texas, on the twenty-fourth day of December, 1885, the appellant was convicted of murder in the second degree and his punishment was assessed at seven years' confinement in the penitentiary.

Doctor E. W. Walton, the brother of the deceased, was the first witness for the State. He testified that he was a graduated physician and surgeon, and had been in practice for eight years. He saw the deceased on Christmas day, 1885, which was the day after the wound was inflicted, and at frequent intervals until his death, which occurred on the thirteenth day of April, 1886, during which time witness treated the deceased professionally. George Walton's death resulted from a kidney disease, brought on by a gun shot wound through the right shoulder. The ball which made that wound entered the back and passed through the edge of the right shoulder blade, and through the shoulder joint, fracturing the upper rounded end of the arm bone on the shoulder socket. One fragment of bone, about an inch long, an ·

eighth of an inch thick, and about as broad as a man's finger, and forty or fifty smaller ones, were taken from the wound. Those fragments were separated from the bone partly by the action of the ball in passing through, and partly by suppuration. The irritating presence of the fractured bone prevented the wound from healing during the three and a half months that elapsed between the infliction of the wound and George Walton's death.

About two months after the wound was inflicted, Doctors Wooten, Johnston, Bennett and the witness performed a surgical operation on George Walton, Doctor Wooten using the knife. The flesh was split from the joint of the shoulder, down the upper side of the arm, rather in front, for a distance of six inches. The large piece of fractured bone was found detached from all others. The operation disclosed three fractures of the arm bone, extending down for a distance of four and a half inches, which necessitated the removal of that much of the bone in order to prevent stiffness and preserve the use of the arm. The witness regarded the operation as necessary to save George Walton's life, and as correct surgery. A gradual improvement of the wound followed the operation, impeded twice by the accumulation of pus, which had to be removed. The wound from the ball in front healed up. The incision in the arm and the wound from the ball in the back were purposely kept open to prevent the collection of matter and keep the wound clean.

Shortly before the operation was performed, the witness observed a puffiness about George Walton's eyes and face, which indicated kidney trouble. That indication continued to grow worse. The wound itself gave no great deal of trouble, but continued to improve. The kidney trouble was produced by the absorption by the kidneys of the pus and impure matter produced by the wound. The kidney trouble which caused George Walton's death was that known as Bright's disease of the kidneys, and it was the result of the gun shot wound.

Cross examined, the witness stated that he had treated a few patients for Bright's disease during his eight years of practice. It is not true that Bright's disease is a malady not understood by physicians, nor that there is no regular and prescribed course of treatment for it. The witness had never known a recovery from Bright's disease of the kidneys. No vital part of George Walton's body was touched by the ball, and the wound was not such as physicians would ordinarily regard as mortal. It was first

probed on December 26, 1885, after inflamation had set in to some extent. The fact that the bone was fractured was discovered on the first probing, but the extent of the fracture was not and could not be ascertained until the surgical operation was performed. Small fragments of bone came out of the wound at irregular intervals until the operation was performed, two months after the wound was inflicted. The operation, as described in the examination in chief, resulted in the removal of about four and a half inches of bone, leaving the arm for that distance boneless. That operation resulted in relieving the arm of the stiffness produced by the adhesion of the arm bone to the shoulder socket, and enabled the patient to use his arm in forward and backward motion. The upward action of the arm was to a large extent totally lost. George Walton had never, prior to being shot, suffered from kidney troubles, so far as the witness knew. The kidneys were located at the small of the back, on either side of the spine. The witness could not enumerate all of the causes that will produce Bright's disease. Hard drink and exposure and the taking of exciting drugs will produce it. Exposure alone might produce it. The absorption of pus by the system, especially if the bones be injured, will produce it. This was the first case of Bright's disease produced by the absorption of pus, known to the witness personally. Witness was satisfied that George Walton would not have died from the wound but for the supervention of Bright's disease. The witness could not recall all of the remedies used in the effort to save the patient. The wound in the back was kept open and cleaned often and carefully. The effect of Bright's disease was to clog the kidneys, and remedies calculated to remove that difficulty were administered, the object being to so remove obstruction and dissolve the urine that it could flow freely. Digitalis, potash, buchu and other medicines were given for the purpose stated, but failed to produce the desired effect. Gun shot wounds always cause more or less pus. No vessel or channel of any kind conveys blood directly from the shoulder to the kidneys. In passing from the shoulder to the kidneys, the blood strikes the heart, whence it is thrown into the lungs, and there it is to some extent, but not altogether, purified. George Walton was not addicted to the use of intoxicating liquors, and witness knew of no cause for Bright's disease in his case other than blood poisoning resulting from the wound described.

J. H. Barnett was the second witness for the State. He testi-

fied that he lived at Granger, in Williamson county, Texas. The witness was at the store of Avent & Bell on the night of December 24, 1885, the night on which George Walton was shot. He and the deceased were together. They purchased some Roman candles and furnished them to some boys to fight a duel with. The store had two front doors facing south, and a front gallery about six feet wide running the entire width of the south front from east to west. Walton and witness went from the back end of the house to the front, having started to see the Roman candle duel. Walton passed into and through the east door, and the witness just entered the west door when he heard some one on horseback near the gallery exclaim: "God d—n! Hell! Shall I turn her loose?" Somebody in the crowd gathered about the street answered: "Yes, d—n her; turn her loose!" and a pistol fired. The party who did the shooting was sitting on a gray horse at the west end of the gallery, and was stooping forward when the first shot was fired. When witness looked, the party was in the act of drawing his pistol and had it pointed towards the witness. Witness could see the arm and the pistol. • He heard the pistol snap, and fell backward into a barrel of cocoanuts, scrambled out as well as he could, and went rapidly back into the store, passing between the counter and the west wall. At the middle opening of the counter he met Walton, wearing a pained expression on his face. Closer inspection disclosed a hole in George's coat, and blood flowing freely. The witness thereupon led him into the bed room and put him to bed. Four shots in all were fired. The first one was fired just as the witness reached the door; the second about the time that witness got out of the barrel of cocoanuts, and the third and fourth before witness met Walton at the counter opening. When he got Walton to bed, witness went to the gallery and told the boys that Walton was hurt, and that it was time to stop the frolic. It immediately ceased. A large number of people crowded into the store, and all that were permitted went into the back room to see Walton. The witness could not say who did the shooting, but it was a heavy set man of average height, dressed in dark clothes and mounted on a whitish colored horse. Witness was between six and ten feet distant from that man. The witness met the defendant shortly before the shooting. Defendant and the man who did the shooting were of about the same size and general appearance. At least twenty persons were standing on or near the store gallery. A light was burning in the store.

Cross examined, the witness said that a Christmas tree was exhibited in Granger on the night of the shooting. It was attended by about two hundred people. A large number of the people had gone home, but the Christmas frolic was still in progress. Fire crackers, Roman candles and other explosives were being fired. Walton and witness had provided Roman candles for a "Roman candle duel," to be fought by two boys, and were on their way to witness the duel when the shooting occurred. Walton had passed from the interior of the store to the gallery, and witness had just reached the door when the party exclaimed: "God d—n! Hell! Shall I turn her loose?" Witness heard no quarreling, nor did he see or hear anything indicating ill will or bad humor on the part of anybody. George Walton was a very popular young man. Witness could not say that the party who did the shooting saw either him or Walton. Walton stood obliquely behind the party who did the shooting. The height of the gallery on which he stood brought his shoulder about to a level with the man on horseback who did the shooting.

The witness could recall seeing three parties on horseback at the time the shooting took place, although there might have been other horsemen in the crowd. The shooting took place between half-past nine and half-past ten o'clock. It was a moonless but starlight night. When the second shot was fired the arm of the party who fired it was moving upward and westward. When the witness announced the wounding of George Walton the frolic stopped at once, and the parties engaged in the frolic crowded into the house, expressing great sympathy and sorrow for Walton. The defendant was among that number, but he was not one of the few permitted to go into the back room to see Walton. The witness could not say why he was excluded. Of those present at the time of the shooting the witness could remember by name, L. D. Ashmore, Will Ashmore, Will Adams and Wilson Squires. All parties were full of fun and engaged in a Christmas frolic. The witness testified about this identical transaction on the twenty-fourth day of January, 1886, on a trial of this defendant. He testified on that trial just as he has testified on this.

On redirect examination, the witness stated that the position of the hand of the man who fired the shots, when the first shot was fired, was as stated on witness's examination in chief. When the pistol snapped it was pointed directly at the witness, and

had it then exploded witness would have been shot.  He saw both the barrel and the chamber opening.

Red Handley was the next witness for the State.  He testified that he was thirteen years old, and lived in Williamson county, about one mile from the town of Granger.  Witness was in the town of Granger on Christmas eve night, 1885, at which time a Christmas tree was exhibited, followed by a Christmas frolic. He went to Avent & Bell's store, and saw George Walton there about fifteen minutes after he arrived.  He heard and saw the four shots fired, but at that time did not know the man who fired them.  The man was sitting on a gray horse near the gallery when he fired the shots, and wore a light colored hat.  The witness stood on the gallery about five feet from him when he did the shooting.  He said nothing at the time that the witness could recall.  He was facing west when he fired the four shots, which were fired in tolerably rapid succession.  After the last shot he rode off west, and returned within about a minute and a half.  The defendant is the man who fired the four shots.

Cross examined, the witness stated that the moon shone faintly on the night of the shooting.  The crowd congregated about the place of the shooting was engaged in exploding fire crackers, Roman candles, etc.  The defendant fired the first shot to the north, the second south and the third north, when witness ran into the store.  If the defendant fired either of the four shots upward, the witness did not know it.  If he snapped his pistol before firing the first shot, the witness did not hear it, and he thought that he could hardly fail to hear it, standing as he did within three feet of defendant.  The balls fired at the second and third shots hit the side of the store house.  The witness did not see William Adams strike a match and look at the defendant. Defendant left after he fired his last shot, but rode back, hitched his horse and went into the store.  Twenty or thirty people were standing about when the first shot was fired.

William Adams testified, for the State, that he lived on Posey's place, in Williamson county, Texas, about a mile from the town of Granger.  He attended the exhibition of the Christmas tree in Granger, on the night of December 24, 1885, and was on Avent & Bell's gallery when the four shots described by previous witnesses were fired.  The man who fired them was on horse back, near the gallery, and about eight feet distant from the witness. He was astride a gray or white horse, and wore a light colored hat.  Witness did not then know the man.  After firing the last

shot, the man rode off, but returned within two and a half minutes, when witness went near him, struck a match and saw that he was the defendant.

Cross examined, the witness testified that the first shot was fired by the man from behind, as he pulled his pistol, and the second shot was fired in the air. The pistol snapped twice between the second and third shots. Witness heard as many as six pistol shots before the four described were fired by the defendant, but he did not know who fired any of them. Everything that witness saw done in the crowd that night was done in fun. Witness was on Avent & Bell's gallery, between the two front doors, when the shots were fired by the defendant, and thought that the second shot came in his direction. Two or three parties on horse back were near the gallery at the time of the shooting. Defendant came back to the store house after he rode off and asked who it was that was hurt. Witness saw three gray horses in the crowd on that night. The defendant rode the largest of the three. The witness testified against the defendant on his trial in January, 1886, for assault with intent to kill Walton. That and this transaction were the same. The Ashmore boys, Squires and Wright were present when the shooting occurred.

W. L. Ashmore was the next witness for the State. He testified that he was on the gallery of Avent & Bell's store in Granger on the night of December 24, 1885, when George Walton was shot. Some one on a gray horse and wearing a white hat, standing near the west end of the gallery, facing west, exclaimed: "God d—n! Hell! Shall I turn her loose?" Somebody replied: "Turn her loose and be d—d." Four shots were then fired in tolerably rapid succession by the man on the gray horse. George Walton had just stepped from the store to the gallery, and when the first shot was fired he was standing obliquely behind the man, about six feet distant. The witness could not say positively who that man was. He left after the shooting. A man who, the witness felt morally certain, was the man who did the shooting and went off, came to the store about five minutes later. The man who came back was the defendant. The witness could not positively say which of the shots struck Walton, but, judging from the elevation of the pistol, he thought it must have been either the first or the second shot. The third shot was fired after the pistol was elevated. The fourth shot was fired by the party after he got beyond the end

of the gallery, moving off. There was a slight interval between the first and second shots. The second, third and fourth shots were fired in rapid succession. William Adams lit a match and looked into a man's face. That man was the defendant, and the man who, according to the witness's best judgment, did the shooting.

Cross examined, the witness stated that the second shot was fired in a northerly direction. The third shot was fired in the same direction, but the pistol was more elevated. The fourth shot was fired just as the man got around the corner of the store. Nothing was said to the defendant when Adams struck the match, though it was then known that Walton was wounded. There were some ten or twelve horses, including three gray ones, in the crowd when the shooting occurred. The shooting occurred during the course of a Christmas frolic, enlivened by the explosion of rockets, fire crackers, Roman candles, and some pistols. Every thing done seemed to be in fun. Witness saw nor heard nothing to indicate ill will or bad feeling on the part of any body. Walton was exceedingly popular about the neighborhood of Granger. Witness did not know whether or not he and defendant were acquainted. Witness testified about this same transaction in January, 1886, when defendant was tried for assault with intent to kill Walton.

N. H. Wilson, the next witness for the State, testified that he was standing near Avent & Bell's store in Granger on the night of the shooting. He heard and saw four shots fired by a man on horse back. Witness saw only the man's side face, but believed from his build that the man was the defendant. He saw the defendant shortly after the shooting at the store, and thought then and thinks now that he was the man who fired the shots.

Cross examined, witness stated that if, on the morning after the shooting, the defendant had been placed in a line of a thousand men, he, witness, could not have pointed him out as the man who did the shooting. The witness saw the first shot, and the blaze from the second, third and fourth shots. The second shot was fired from about the corner of the gallery, and the third after the party had passed beyond the corner. Witness thought that all the shots were fired upwards. Every body seemed to be in good humor. This is the same transaction about which the witness testified in January, on defendant's trial for assault with intent to murder George Walton.

Ernest McLaughlin testified, for the State, that he was at Avent's store, in Granger, on the night of the shooting. He saw the defendant at that store, riding a gray horse, and was of opinion that he was the man who asked: "Shall I turn her loose?" The witness replied: "Turn her loose!" thinking the question referred to a fire cracker, Roman candle or other harmless explosive. The witness was then sitting on a light colored or gray horse near enough to the southeast end of the gallery to touch it with his foot. He had on a light colored hat. The witness rode off by himself after the shooting. He did not shoot Walton. He had no pistol on that night. The witness was indicted for assault with intent to murder Walton, but did not know it when he left the country at the last term of the court. The witness left the country to avoid testifying in this case, and not because he was afraid of prosecution. Witness did not see the shooting. Witness did not observe a gray or white horse west of him, or near the gallery. Walton was quite popular, and, if anybody had a grudge or ill feeling towards him, the witness did not know it. Witness had no idea of any one being hurt when he called out to "turn her loose." The State rested.

Sheriff Olive testified, for the defense, that he had the defendant in custody on a former charge of assault with intent to murder George Walton. The defense then proposed, but was not allowed, to prove by the witness that defendant had paid part of the fine assessed against him under the former judgment, and was still in custody.

The defense next introduced in evidence the indictment charging the defendant with an assault to murder the deceased, the record of the court showing the proceedings on the trial under the said indictment, the charge of the court on the said trial, and the judgment rendered upon the verdict finding the defendant guilty of an aggravated assault and assessing his punishment at a fine of two hundred dollars.

The motion for new trial raised the question discussed in the opinion.

*Fisher & Townes*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. Appellant was indicted at the July term, A. D. 1886, district court of Williamson county, for the murder

of George Walton, on December 24, 1885. The wound was in-
flicted on that day, but Walton did not die until April 13, 1886.
In the January term of same court, 1886, appellant had been in-
dicted for assault with intent to murder Walton, and was tried
at that term on that indictment, and convicted and punished for
an aggravated assault. At the July term, 1886, he was placed
upon trial on the second indictment, pleaded, specially, former
jeopardy, former acquittal and former conviction, and also not
guilty. His special plea was found untrue, and he was convicted
of murder of the second degree, and his punishment fixed at
seven years confinement in the penitentiary.

The defendant's first three assignments of error, which involve
the same principle, are submitted and will be considered together.
The question presented by these assignments is well stated in
the argument of counsel for defendant as follows: "Does a
prosecution upon indictment, in a court having jurisdiction of
that offense, for assault with intent to murder, instituted in good
faith by the State, and prosecuted to a final determination on
the merits, prior to the death of the party injured, which results
in a verdict acquitting of all grades of offense higher than ag-
gravated assault, and a conviction of that offense and payment
of all penalties denounced, have any effect upon a prosecution
for murder, based upon the death of the party, resulting from
the identical act of the defendant upon which the former prose-
cution was predicated?"

In Johnson v. The State, 19 Texas Court of Appeals, 453, we
held that a *conviction* of aggravated assault and battery, upon
an indictment charging an assault with intent to murder, could
not bar an indictment for murder, although the assault and bat-
tery was the same act which produced the murder, because, at
the date of the conviction of the assault and battery, the party
assaulted was living, and the offense of murder had not then
been completed. In support of this view we cited those standard
authors, Wharton and Bishop (Whart. Cr. Pl. & Pr. sec. 476; 2
Bish. Cr. Law, sec. 1059), whose texts fully sustain our decision;
and in support of their texts they cite a number of decisions,
only a few of which we have had access to, but as far as we
have examined the cases cited they sustain the texts of those
eminent authors. The reason of the doctrine is well stated in a
Scotch case by Lord Ardmillan as follows: " There never can be
the crime of murder till the party assaulted dies; the crime has
no existence in fact or law till the death of the party assaulted.

Therefore, it can not be said that one is tried for the same crime when he is tried for assault during the life, and tried for murder after the death, of the injured party. That new element of the injured person's death is not merely a supervening aggravation, but it creates a new crime." (Stewart's case, 5 Irvine, 310, cited in note to sec. 1059, 2 Bish. Cr. Law.)

We believe this doctrine to be sound in principle and sustained by unanswerable reason. The *assault* and the *murder* are not the same *offense* within the meaning of the words "same offense," as·used in the Constitution. If the offense of murder had been completed by the death of the injured party at the time of indictment found, then the assault would be included in the murder, and the State could carve but one offense out of the transaction, and if, in such case, the indictment be for an assault, a conviction or an acquittal thereunder would be a bar to a prosecution for any grade of homicide. But this doctrine of carving has no application to the case under consideration, because at the time of the first prosecution there was no offense of murder, and the State had no election to carve as between an assault and any grade of homicide. We do not think that this view of the question conflicts with, or in any way infringes upon, any provision of our Constitution, for the simple reason that the offense of which the defendant was first convicted or acquitted is not the same offense for which he is being tried, within the meaning of the Constitution and the law the offense for which he is being tried having no existence at the time of said first conviction or acquittal.

Between the Johnson case, *supra,* and the one before us there is this difference: Johnson was, upon the second prosecution, convicted of *manslaughter* only, while this defendant stands convicted of *murder* in the second degree. It is insisted by counsel for defendant, in a very able argument, that this difference in the cases is very material, in this, that the effect of defendant's conviction of an aggravated assault and battery in the first prosecution under the indictment charging an assault with an intent to murder was to *acquit* defendant of *malice,* and therefore he could not thereafter be tried for and convicted of murder, because *malice* is an essential ingredient of murder. That he could only be tried and convicted for a grade of homicide not involving *malice.* This argument is very plausible, and, when first presented, it appeared to us unanswerable. But upon reflection we are satisfied it is specious. A complete answer to

it, · in our judgment, is that the acquittal of the defendant of the charge of assault with intent to murder was not necessarily a finding by the jury that the defendant was not actuated by malice in committing the assault. The jury may not have been satisfied from the evidence that he committed the assault with a *specified intent to kill* the injured party, and upon this ground alone may have acquitted him of that offense. This specific intent is as essential an ingredient of the offense of an assault with intent to murder as is malice, while it is not an essential ingredient of murder. Murder may be· committed when there is no specific intent to kill the deceased. It is plain to our minds that the verdict of the jury convicting the defendant of an aggravated assault and battery can not be held to be necessarily an acquittal of the charge, that the act was committed with malice aforethought. It was an acquittal of the charge of assault with intent to murder, but it can not be claimed that it was an acquittal of each and every separate ingredient of that offense. If the jury could not have acquitted him of said offense upon any other ground than the absence of malice on his part in the commission of the act, the position contended for by counsel would be sound, and we would have to. hold that defendant could be tried for no higher grade of homicide than manslaughter. These being our views we answer the question propounded by defendant's counsel in the negative and hold that there was no error in the rulings or charge of the court with reference to defendant's special pleas.

It is objected to the charge of the court that it does not submit to the jury the law of negligent homicide. It is contended by counsel for defendant that the issue of negligent homicide in the second degree is fairly raised and presented by the evidence, and we concur with counsel in this view of the evidence.

One phase of the case, that relied on by the State, is that the defendant "voluntarily, unlawfully and wantonly, and with utter and reckless disregard of human life, shot off a pistol into and among a crowd of men, and in doing so did inflict a wound upon George Walton, then in said crowd," from which wound said Walton died. This phase of the case is strongly supported by the evidence, and was submitted to the jury by the charge of the court.

But defendant's counsel insists that there are two other phases of the case, to-wit: First, that the killing was accidental; and,

second, that it was the result of negligence and carelessness while the defendant was in the performance of an unlawful act, that is, while defendant was committing a misdemeanor by discharging his pistol in a public place. As to the first of these phases the court sufficiently instructed the jury. As to the other no instruction was given.

While the evidence in support of this last named phase of the case may not be satisfactory, or even strong, still there are facts in proof which fairly present the issue, and tend to establish the theory that the offense committed was that of negligent homicide of the second degree. This being our view of the evidence, we hold that the law of negligent homicide of the second degree was a part of the law of the case, and that the failure of the court to give it in charge to the jury was error, for which the judgment must be reversed. We do not recite the evidence upon which we base this conclusion, as the facts will be stated by the reporter, and it will be seen therefrom that the jury might well have concluded that the killing was not a higher grade of homicide than negligent homicide of the second degree.

As to other objections made to the charge of the court we shall not consume time in discussing and determining them, as upon another trial the supposed errors complained of are not likely to occur.

Because the court omitted to charge the law of negligent homicide of the second degree the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered November 13, 1886.